IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KAREN Y. SHIPMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 06-cv-0242-MJR |
| | ) |
| ERIC HAMILTON, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM and ORDER**

**REAGAN, District Judge:**

**A.     Procedural History**

On March 24, 2006, Plaintiff Karen Y. Shipman filed this cause of action against Randolph County Deputy Sheriff Eric Hamilton ("Defendant") (*see* Doc. 1). Plaintiff asserts Defendant arrested her without probable cause, thereby depriving her of her constitutional rights in violation of **42 U.S.C. § 1983.** Now before the Court is Defendant's motion for summary judgment (Doc. 18). For the reasons that follow, the Court hereby **DENIES** that motion (Doc. 18).

**B.     Factual Background**

On April 29, 2005, Plaintiff Karen Shipman, a registered nurse on duty at the Sparta Community Hospital ("hospital"), was arrested by Defendant and charged with two violations: (1) "obstructing service of process," and (2) "obstructing a peace officer" (*see* Doc. 21, Ex. A, "Copy of Complaint & Summons- Violator's Copy").

At approximately midnight on that date, Defendant was attempting to serve an

emergency order of protection on a patient at the hospital, Roscoe Handsbury. Defendant and another deputy, Rod Queen, entered the hospital around 11:50 P.M. (*See* Doc. 19, Ex. B, Deposition of Eric Hamilton ("Hamilton Dep.") at 80). Upon entering the hospital, Defendant, along with Queen, approached the nurses' station and inquired of the whereabouts of Handsbury and informed the individuals present at the nurses' station that he had to serve papers on Handsbury (*See* Doc. 19, Ex. A, Deposition of Karen Shipman ("Shipman Dep.") at 12). Plaintiff, who was at that time the highest-ranking nurse on the floor, stated to Defendant that she was Handsbury's nurse. The parties offer differing accounts as to how the rest of the interaction proceeded.

Plaintiff, on her part, asserts that she pointed out to Defendant and Queen where Handsbury was located in the hospital, pointing out the exact room that he was in, a "sort of ICU environment," and telling the officers that Handsbury was "the only one in [that room]" (*see* Doc. 21, Attachments 18-24, Deposition of Rod Queen ("Queen Dep.") at 15). Queen, the officer accompanying Defendant, agrees with Plaintiff that Defendant was then aware of Handsbury's location (*see* Queen Dep. at 27). In fact, Queen testified, they "could see [Handsbury] through the window, and he was watching [Queen and Defendant] pretty much the whole time." *Id.* at 15.

Defendant offers a different account of Plaintiff's initial response to his approach, asserting that Plaintiff "wouldn't take us or tell us where [Handsbury] was" (Hamilton Dep. at 88). Nonetheless, all parties agree that Plaintiff never physically blocked the doorway or physically disallowed the officers from gaining entry through the door of the room in which Handsbury was located.

The parties further agree that Plaintiff described Handsbury's medical condition to Defendant, and told Defendant that she "need[ed] to call [Handsbury's] doctor," because she "didn't

know if [Handsbury] had improved a lot, because [Handsbury] had been extremely upset and crying a lot all day long, very torn up" (Shipman Dep. at 16). Plaintiff explained to Defendant that "it might be best to [enter the room and serve process] whenever the doctor [was] [there] ... to be with [Handsbury] since he was in [an ICU- like area] and he wasn't doing well at all." *Id.* at 18.

Plaintiff further informed the officers that she did not feel that she had the authority to allow them into the room to serve Handsbury, as she "had no authority except to care for [her] patient," and was an agency nurse (Shipman Dep. at 62). Moreover, Plaintiff was concerned that "being 12:30 at night when a [sixty year old] patient ... so ill has been medicated and they're asleep, ... to go in and wake them up in the middle of the night ... would cause [the patient] to stroke or [suffer other medical complications] if his heart was bad ..." *Id.* at 32. Plaintiff also feared that allowing the officers into Handsbury's room might have violated her obligations under the Health Insurance Portability and Accounting Act (HIPAA); she felt "liability, because a nurse is supposed to have good, prudent judgment." *Id.*

Because of these concerns, Plaintiff decided her best course of action was to "follow[] through with [her] chain of command." *Id.* Plaintiff first called the on-call doctor, Dr. Salarda, who suggested that Plaintiff contact Plaintiff's supervisor, the Director of Nursing, Kathy Lehr. *Id.* at 42, 45, 61. Plaintiff did so. Lehr, on her part, called the CEO of the hospital, and thereafter called Plaintiff back, who then gave the phone to Defendant after speaking briefly with Lehr. *Id.* at 20. Lehr (as Dr. Salarda had suggested to Plaintiff) suggested to Defendant that the officers return to the hospital at 8:00 a.m. the next morning in order to serve Handsbury while his doctor was present.

After handing the phone over to Defendant, Plaintiff felt that she was "done" and had "no reason to talk" to the officers anymore at that point, because she "figured things would be taken

care of [then]." *Id.* at 34.  Plaintiff resumed her nursing duties and was "putting an IV together and getting ready to go hang it," when Defendant got off the phone with Lehr and again approached Plaintiff, telling her that she had "blocked his way [of serving process] when [she] called the medical doctor ..." and that he was therefore going to arrest her. *Id.* at 34.

According to Plaintiff, Defendant then demanded she give him her name. The parties give a differing account of Plaintiff's response: Plaintiff asserts that she did not answer because she was "just honestly stunned," (*Id.* at 34), whereas Defendant asserts that Plaintiff stated "I am not telling you who I am." (Hamilton Dep. at 82).  According to Plaintiff, Defendant responded by saying "okay, that does it," and grabbed her by the arms, cuffed her, and then forced her down the hallway, out of the hospital (Shipman Dep. at 34- 35).  Defendant agrees that he arrested Plaintiff at that time.

**C.      Analysis**

Plaintiff claims that Defendant, while acting under color of state law, deprived her of her constitutional rights, in violation of **42 U.S.C. § 1983**, by arresting her without probable cause.

*Applicable Legal Principles*

Section 1983 provides a federal cause of action for violation of an individual's constitutional civil rights under color of state law.  The *prima facie* requirements for a § 1983 cause of action differ depending upon the manner in which the plaintiff alleges her constitutional rights were violated.  To establish a *prima facie* case in a § 1983 action based on an officer's unlawful arrest, a plaintiff must prove by a preponderance of the evidence that her arrest was carried out in the absence of probable cause. **See Schertz v. Waupaca County, 875 F.2d 578, 582 (7th Cir. 1989)(the existence of probable cause for an arrest is an absolute bar to a 1983 claim for unlawful arrest).**

As mentioned, Plaintiff was arrested and jailed at the Randolph County Jail for two violations: (1) obstructing service of process, and (2) obstructing a peace officer (*See* Doc. 21, Ex. A, "Copy of Complaint & Summons- Violator's Copy").

*Obstructing Service of Process*

Illinois Statute **720 § 5/31-3**, titled "Obstructing Service of Process" provides, "[w]hoever knowingly resists or obstructs the authorized service or execution of any civil or criminal process or order of any court commits a Class B misdemeanor." **720 ILL.COMP.STAT. 5/31-3.** The Illinois Pattern Jury Instructions define Obstructing Service of Process as follows: "[a] person commits the offense of obstructing service of process when he knowingly resists or obstructs the authorized service or execution of any [(civil) (criminal)] process or order of a court." **Ill. Pattern Jury Instr.-Criminal 22.17 (4th ed.).**

*Resisting or Obstructing a Peace Officer*

Under the Illinois obstruction of a peace officer statute, **720 ILL.COMP.STAT. 5/31-1**, anyone who "knowingly resists or obstructs the performance by one known to the person to be a peace officer ... of any authorized act within his official capacity commits a Class A misdemeanor." **720 ILL. COMP. STAT. 5/31-1 (2002);** *See Williams v. Jaglowski*, **269 F.3d 778 (7th Cir. 2001)**. Generally, a violation of **§ 5/31-1** requires an act of physical resistance. *See People v. Stoudt*, **555 N.E.2d 825 (Ill. App. Ct. 1990)**. Moreover, "'mere silence' in the face of requests [from the police] for identifying information, or even supplying false information, is not enough to constitute obstruction." *Williams*, **269 F.3d at 782; see also** *People v. Raby*, **240 N.E.2d 595, 599 (Ill. 1968).** Nonetheless, Illinois Courts have recognized that an exception exists when an individual's silence directly prevents an officer from carrying out a duty imposed by court order and by statute. *See*

*Migliore v. County of Winnebago,* **321 N.E.2d 476 (Ill. App. 2d. 1974).**

*Defendant's Arguments for Summary Judgment*

In moving for summary judgment, Defendant asserts two arguments: (a) that he is shielded from liability under the doctrine of qualified immunity, and (b) that summary judgment is appropriate because no genuine issues of material fact remain, and he is entitled to judgment as a matter of law.

*Qualified Immunity Analysis*

The doctrine of qualified immunity is an "entitlement [for certain government officials] not to stand trial or face the other burdens of litigation" **Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).** As such, it is important for a Court to resolve any immunity questions at the earliest possible stage in litigation. **Hunter v. Bryant, 502 U.S. 224, 227 (1991).** Although the respective analyses are similar, the requisite analysis to determine qualified immunity is not so intertwined with the constitutional violation issues so as to be treated as one question. **Saucier v. Katz, 533 U.S. 194, 197 (2001).** Accordingly, before considering Defendant's argument for summary judgment pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 56**, this Court must first conduct a separate analysis of Defendant's qualified immunity assertion.

"A court required to rule upon the qualified immunity issue must first consider whether, [t]aken in the light most favorable to the party asserting the injury..., the facts alleged show the officer's conduct violated a constitutional right." **Saucier, 533 U.S. at 201.** Taking the facts in this case in the light most favorable to Plaintiff, the Court finds that Defendant's actions violated Plaintiff's constitutional rights.

Construing the underlying circumstances in favor of Plaintiff, the Court accepts

Plaintiff's assertion – which is corroborated by Officer Queen – that she showed Defendant exactly where Handsbury was located within the hospital. In fact, according to Queen, both officers "could see [Handsbury] through the window, and he was watching [Queen and Defendant] pretty much the whole time" (Queen Dep. at 15). Defendant himself even admitted in his deposition that he "could have just walked in and served [process]" on Handsbury (Hamilton Dep. at 81). Moreover, neither Defendant, Plaintiff, nor any other third party has testified that there was any action taken by Plaintiff to physically prevent the officers from simply entering the room, or from otherwise effecting service of the court order.

Viewing the facts in the light most favorable to Plaintiff, the *worst* Plaintiff did was to refuse to give Defendant express authority – authority she was not even sure was hers to grant – to enter the room and serve Handsbury. However, because Defendant himself admits that he nonetheless simply could have walked into the room and served process, Plaintiff's actions can not be said to have truly "resisted or obstructed" service of process. Nor can Plaintiff's simple refusal to state her name to Defendant be considered resistance or obstruction; Defendant did not require knowledge of Plaintiff's identity in order to enter the room wherein Handsbury was located and effectuate service.

Accordingly, viewing the underlying circumstances in the light most favorable to Plaintiff, Defendant did not have probable cause to arrest Plaintiff either for obstructing service of process or for resisting an officer. Lacking probable cause, Defendant's arrest of Plaintiff would be a violation of her constitutional right to be free from unreasonable search and seizure of her person under the Fourth and Fourteenth Amendments to the United States Constitution.

If, as in this case, a violation of a plaintiff's constitutional rights can be made out on

a favorable view of the plaintiff's submissions, the next step in a qualified immunity analysis is to determine whether the rights were "clearly established." *Saucier,* **533 U.S. at 201.** The right of a citizen to be free from a search or seizure in the absence of probable cause is a clear and long-established right. The Court does not seriously entertain an argument that a reasonable police officer would be unaware of this right, nor does Defendant propose such an argument.

Nonetheless, the Supreme Court has made clear that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "The right the official is alleged to have violated must have been 'clearly established' in a... particularized and relevant sense: [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* **at 202,** *citing Anderson v. Creighton,* **483 U.S. 635, 640 (1987).** "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* **533 U.S. at 202.**

Construing the facts in favor of Plaintiff, Defendant confronted the following "situation" in his endeavor to serve process: Defendant encountered a person who identified and directed him to Handsbury's location, did not physically impede him from entering the room himself to serve process, and then returned to work. Although Defendant asserts that Plaintiff's "actions in walking away and returning to work" were sufficient for him to believe Plaintiff was committing an offense, the Court can not agree that a *reasonable* officer in Defendant's position would have drawn the same conclusion.  If Defendant simply could have walked into the other room and served Handsbury, as Plaintiff asserts was the case, arresting Plaintiff instead of doing so not only would have been violative of her constitutional rights, but also seems to have been grossly

counterproductive. Perhaps if the door had been locked, if Plaintiff had somehow physically blocked the door, or if Defendant had been refused access into an individual's private residence – as officer Queen refers to in his deposition (Queen Dep. at 82) – the Court's analysis may be different. But the present analysis focuses neither on hypothetical propositions (*e.g.,* "denial of admission ... [into] a *household*") nor "broad general proposition[s]" (*e.g.,* "*anybody* impeding the service of court-ordered papers, or getting in the way, or attempting to stop the service of those papers ..."); the present analysis focuses on the specific context of *this* case. *See Saucier,* **533 U.S. at 201; Queen Dep. at 82.** In the present context, the Court **FINDS** that Defendant is not entitled to qualified immunity.

*Summary Judgment Analysis*

Defendant also moves for summary judgment pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 56,** asserting there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law.

Summary judgment is proper if the pleadings, depositions, interrogatory answers, admissions, and affidavits leave no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. **FED. R. CIV. P. 56(c).** The moving party bears the burden of establishing both the absence of fact issues and entitlement to judgment as a matter of law. *Santaella v. Metropolitan Life Ins. Co.*, **123 F.3d 456, 461 (7th Cir. 1997).**

In determining whether a genuine issue of material fact exists, the Court reviews the record in the light most favorable to the non-moving party and makes all reasonable inferences in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 255 (1986);** *Ulichny v. Merton Community School Dist.*, **249 F.3d 686, 699 (7th Cir. 2001);** *Miranda v. Wisconsin Power & Light Company*, **91 F.3d 1011, 1014 (7th Cir. 1996).**

As mentioned, in order to establish a *prima facie* case in a § 1983 action based on an officer's unlawful arrest, a plaintiff must prove by a preponderance of the evidence that her arrest was carried out in the absence of probable cause. **Schertz, 875 F.2d at 582.** The probable cause standard is incapable of precise definition, because it deals with probabilities and depends upon the totality of the circumstances. **Maryland v. Pringle***,* **540 U.S. 366***,* **371 (2003),** *citing* **Brinegar v. United States, 338 U.S. 160, 175 (1949).** However, the substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and the belief must be particularized with respect to the person to be searched or seized. **Ybarra v. Illinois, 444 U.S. 85, 91 (1979).**

Summary judgment is inappropriate in this matter for the same reason that this Court found the first half of the qualified immunity analysis met: taking the facts in the light most favorable to Plaintiff, Defendant was without probable cause to arrest Plaintiff either for obstructing service of process or for resisting an officer. According to Plaintiff (and Officer Queen, in part) Plaintiff showed Defendant exactly where Handsbury was located within the hospital, so that Defendant himself even admitted in his deposition that he "could have just walked in and served [process]" on Handsbury (Hamilton Dep. at 81). Moreover, neither Defendant, Plaintiff, nor any other third party has testified that there was an overt act by Plaintiff to prevent the officers from simply entering the room, or from otherwise effecting service of the court order. These facts do not entitle Defendant to judgment as a matter of law.

Moreover, the numerous disputed issues of material fact in this matter further underscore the necessity of a jury trial. For instance, as this Court has already mentioned, Defendant testified that Plaintiff "wouldn't take us or tell us where [Handsbury] was ..." (Hamilton Dep. at 88). Yet, both Queen and Plaintiff testified that Plaintiff *did* in fact "point[] Handsbury out [to the officers]

and told [them] where he was." (Queen Dep. at 15). Moreover, whereas Defendant claims that Plaintiff purposely delayed service of process by deciding to contact her supervisor, Queen testified that it was *Defendant* who suggested that Plaintiff call her supervisors (Queen Dep. at 26, 49, 50).

Accordingly, because several issues of material fact remain in dispute and because, taking the evidence in the light most favorable to Plaintiff, Defendant is not entitled to judgment as a matter of law, the Court **DENIES** Defendant's motion for summary judgment pursuant to **FED. R. CIV. P. 56.**

D.      Conclusion

For the above-stated reasons, the Court **FINDS** that Defendant is not entitled to qualified immunity and is not entitled to judgment as a matter of law pursuant to **FED. R. CIV. P. 56.** Accordingly, the Court **DENIES** *in its entirety* Defendant's motion for summary judgment (Doc. 18).

**IT IS SO ORDERED.**

**DATED this 9th day of May, 2007.**

s/ Michael J. Reagan
**MICHAEL J. REAGAN**
**United States District Judge**